UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

SYLVESTER DZIENNIK, MIECZYSLAW
KIERSZLYN, FERDYNAND KOBIERSKI,
individually and on behalf of all          REPORT &
persons similarly situated,                RECOMMENDATION

                    Plaintiffs,

          - against -                      CV 2005-4659 (DLI)(MDG)

SEALIFT, INC., FORTUNE MARITIME INC.,
SAGAMORE SHIPPING INC., VICTORY
MARITIME, INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - X

JOSEF FELSKOWSKI,

                    Plaintiff,

          - against -                      CV 2004-1244 (DLI)(MDG)

SEALIFT, INC., SAGAMORE SHIPPING,
INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - X

GO, United States Magistrate Judge:

     Plaintiffs bring this class action against defendants

Sealift, Inc. ("Sealift"), Fortune Maritime Inc. ("Fortune"),

Sagamore Shipping, Inc. ("Sagamore") and Victory Maritime, Inc.

("Victory") (collectively the "Sealift defendants") for violations

of the federal maritime law seeking recovery of unpaid wages and

statutory penalties.  Plaintiff Josef Felskowski brings his

individual action against defendants Sealift and Sagamore seeking

the same relief.  Plaintiffs move for partial summary judgment on the application of 46 U.S.C. § 11107 and the application of 46 U.S.C. § 10313 to their claims.  Defendants cross-move for summary judgment and to compel arbitration of the claims of the Filipino plaintiffs or to dismiss those claims for improper venue under Federal Rule of Civil Procedure 12(b)(3).

For the reasons set forth below, I respectfully recommend that plaintiffs' motion for partial summary judgment be granted in part and denied in part and that defendants' motions for summary judgment and to compel arbitration or to dismiss be denied.

## PROCEDURAL BACKGROUND

Plaintiff Felskowski commenced his individual action on March 25, 2004 for personal injuries, breach of a collective bargaining agreement and violations of the Federal Labor Standards Act ("FLSA"), 29 U.S.C. § 206, and federal maritime law.  Plaintiff Felskowski moves for partial summary judgment on his remaining maritime wage claims.  Although defendants cross-moved for summary judgment, the Honorable Dora L. Irizarry denied defendants' motion for failing to follow her motion practice rules.  See ct. doc. 31; endorsed order dated August 29, 2005.  On April 6, 2006, Judge Irizarry referred plaintiff's motion to me for a report and recommendation.  However, I deferred ruling on plaintiff Felskowski's motion pending Judge Irizarry's ruling on the motion for class certification in Dziennik.

-2-

The Class Plaintiffs commenced this class action on October 3, 2005 alleging causes of action for breach of employment contracts and a collective bargaining agreement, violation of 46 U.S.C. § 11107 through the engagement of seamen "contrary to a law of the United States" and violation of 46 U.S.C. § 10313 for "refusal and neglect to pay the seafarers their full balance of wages due without sufficient cause." See ct. doc. 1. On August 30, 2006, Judge Irizarry granted defendants' motion to dismiss the breach of the collective bargaining agreement claim but denied the motion as to the remaining claims. See ct. doc. 36. The Court also dismissed the action against defendants Sealift Chemicals, Inc., Sealift Tankships, Inc., Remington Shipping, Inc. and Wilson Shipping, Inc. because plaintiffs lacked standing to sue them. Plaintiffs subsequently withdrew their breach of contract claims against the remaining defendants.

On May 29, 2007, the Court certified a class of Polish and Filipino seamen who were employed on vessels owned, operated or managed by one or more of the defendants at any time since January 1, 1999. Plaintiffs' counsel had represented that if class certification was granted, plaintiff Felskowski would move to consolidate his claims with that of the class and proceed as a member of the class. See Motion for Class Certification at 13 & n.7 (ct. doc. 28).

On November 2, 2007, with the consent of the parties, Judge

Irizarry granted the defendants' motion for joinder of the actions and consolidated the class action with Mr. Felskowski's individual action.  See minute entry dated November 2, 2007.  Since defendants Victory and Fortune are not parties to the Felskowski action, they had not had the opportunity to respond to the arguments set forth in Felskowski's motion for summary judgment. These defendants subsequently responded to the motion and all the defendants cross-moved for summary judgment in Dziennek.  See ct. doc. 74.  In an entry filed June 23, 2008, Judge Irizarry referred to me for report and recommendation the cross-motions for summary judgment.  See entry dated June 23, 2008.

The parties have also cross-moved to amend the pleadings in Dziennik to add additional parties and correct allegations and admissions concerning the corporate owners of the various vessels, which will be addressed in a separate order.

## RELEVANT FACTS

The following facts are undisputed.  The named plaintiffs are members of a class of Polish and Filipino citizens who were employed on U.S. flag vessels owned, managed or operated by one or more of the defendants.  Sealift, Inc. acted as managing agent for each of these vessels.  Complaint at ¶ 4(A).  Fortune is the registered owner of the M/V ADVANTAGE.  Id. at ¶ 4(B).  Sagamore is the registered owner of the M/V ASCENSION.  Id. at ¶ 4(C).

Victory is the registered owner of the S/S CLEVELAND. <u>Id.</u> at ¶ 4(E).

Each named plaintiff signed an employment agreement with Sealift, Inc. setting forth the wages to be paid them and they were paid all of the wages due under the terms of those agreements. Declaration of Gregory O'Neill dated December 3, 2007 ("O'Neill Decl.") (ct. doc. 80), Exh. B at 9 (Plaintiffs' Responses to Defendants' First Request for Admissions).

Magsaysay Maritime Corporation acted as an employment agent for Sealift, Inc. in the Philippines and recruited the Filipino plaintiffs. Declaration of Maria Valentina S. Cruz ("Cruz Decl.") (ct. doc. 79) at ¶¶ 5, 6. The Philippine government requires that any contract entered into to employ a Filipino seaman outside the country incorporate certain minimum terms and conditions of employment. <u>Id.</u> at ¶¶ 4, 6.

<u>DISCUSSION</u>

Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Citizens Bank of Clearwater v. Hunt</u>, 927 F.2d 707, 710 (2d Cir. 1991) (citations omitted); <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The moving party bears the initial

burden of demonstrating an absence of material facts and once it has done so, the burden shifts to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In determining whether there is a genuine issue of material fact, the court must resolve ambiguities and draw inferences in favor of the non-moving party.  Celotex, 477 U.S. at 322-323; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P.  56(e)).

Under Rule 56(d), the court may grant partial summary judgment.  Fed. R. Civ. P. 56(d).  "The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case." Fed. R. Civ. P. 56(d), Advisory Committee Notes to 1946 Amendment.  The purpose of the rule is to "speed[] up litigation by eliminating before trial matters wherein there is no genuine issue of fact."  Id.

Plaintiffs move for partial summary judgment regarding the application of section 11107 which provides for an amount equal to the highest rate of pay from the port of engagement for the

engagement of a seaman "contrary to a law of the United States." In addition, plaintiffs seek partial summary judgment regarding the application of section 10313 which provides for two days' pay for every day of delay in payment of the balance of wages due, commencing from four days after discharge from a vessel.

I.   Application of Section 11107

Section 11107 states:

An engagement of a seaman contrary to law of the United States is void.  A seaman so engaged may leave the service of the vessel at any time and is entitled to recover the highest rate of wages at the port from which the seaman was engaged or the amount agreed to be given the seaman at the time of engagement, whichever is higher.

46 U.S.C. § 11107.  Section 11107 "provides a statutory default to prevailing market wage in the case of an invalid contract." Flores v. American Seafoods Co., 335 F.3d 904, 912 (9th Cir. 2003); see Harper v. United States Seafoods LP, 278 F.3d 971, 977 (9th Cir. 2002); Maughan v. Tracey Anne, Inc., 141 F.3d 1177 (9th Cir. 1998) ("statutory wage rate"); TCW Special Credits v. Chloe Z Fishing Co., Inc., 129 F.3d 1330, 1333 (9th Cir. 1997).

All the plaintiffs claim that the remedy provided by section 11107 is triggered by defendants' failure to comply with three statutes: (1) section 10302 which requires a shipowner to provide shipping articles; (2) section 8701 which requires merchant mariner documents; and (3) section 8103 which imposes a citizenship or residency requirement.

A.   <u>Violation of section 10302</u>[1]

Section 10302 requires that before a voyage, the owner,
master or individual in charge of the vessel execute a shipping
articles agreement in writing with each seaman.  46 U.S.C.
§ 10302(a).  Specifically, the shipping articles must contain: (1)
the nature and duration of the intended voyage, including the port
or country in which the voyage is to end; (2) the number,
description, and duties of each seaman; (3) the time the seaman
will begin work; (4) the amount of wages; (5) regulations about
conduct; (6) the specific provisions to be provided; and (7)
advances and allotments of wages.  46 U.S.C. § 10302(b).  The
plain language of the statute is mandatory in requiring that the
shipping articles "shall" include the above elements.  <u>See</u> <u>Miller
v. French</u>, 530 U.S. 327, 337-38 (2000) (construing "shall" as a
mandatory statutory command); <u>Lexecon Inc. v. Milberg Weiss
Bershad Hyes & Lerach</u>, 523 U.S. 26, 35 (1998).

The requirement of written shipping articles is designed to
"protect seamen who were otherwise subjected to harsh treatment
and deception."  <u>Sylvis v. Rouge Steel Co.</u>, 873 F.2d 122, 125 (6th
Cir. 1989).  This requirement applies to all seamen, including

---

[1] Although sections 10302 and 10313 apply only to plaintiffs
engaged in foreign voyages, <u>see</u> 46 U.S.C. § 10301, neither party
has submitted any admissible evidence as to whether plaintiffs
satisfy this requirement.  The parties agreed at oral argument
that the Court's rulings on the application of the statutes would
be subject to proof that plaintiffs were engaged in foreign
voyages.

those who are not U.S. citizens.  See Caribbean Federation Lines
v. Dahl, 315 F.2d 370 (5th Cir. 1963); Ktiskakis v. Liberian S.S.
Star, 304 F.2d 356 (4th Cir. 1962); 1 Thomas J. Schoenbaum,
Admiralty & Maritime Law § 6-3 (4th ed.).

It is undisputed that defendants did not provide plaintiffs
with shipping articles as required by statute.  Rather, the
defendants argue that their employment contracts with plaintiffs
are the "functional equivalent" of shipping articles.  This Court
has examined all the employment contracts executed by plaintiffs
and Sealift, which the parties have submitted in support of their
positions.  See O'Neill Decl., Exh. G (contracts of named class
plaintiffs and plaintiff Felskowski); Supplemental O'Neill Decl.
(ct. doc. 95), Exh. A (contracts of Filipino class members); Cruz
Decl., Exh. A (same); Supp. Cruz Decl. (ct. doc. 91), Exh. A
(same); Dodson Decl. (ct. doc. 83), Exh. B (same).  There are
essentially four types of form contracts used, one version for the
Polish class members consisting of eight pages and three versions
for the Filipino class members consisting of one page.  See
O'Neill Decl., Exh. G; Dodson Decl., Exhs. 1, 2 and 3 to Exh. B
(ct. doc. 108-2).  Despite the differences among the various
standard forms, they uniformly fail to describe the nature of the
voyages, including the beginning or ending port, the number or
description of the crew, the specific provisions to be provided,
and are vague as to the duration of the voyages.  Id.  By their

failure to include these essential terms to the contracts, defendants violated the statutory requirements of section 10302. Cf. <u>Doyle v. Huntress, Inc.</u>, 301 F. Supp. 2d 135, 144-45 (D.R.I. 2004) (form agreements violated statute requiring certain terms be included in employment contract between fisherman and defendant), <u>aff'd</u>, 419 F.3d 3 (1st Cir. 2005); <u>Pronav Charter II, Inc. v. Nolan</u>, 206 F. Supp. 2d 46, 50-51 (D. Mass. 2002) (finding that correspondence between seaman and vessel owner did not amount to contract because it did not contain all of the required elements listed in section 10302).

The lone case defendants cite to support their argument that the employment contracts satisfy section 10302 is inapposite. In <u>Sylvis</u>, the Sixth Circuit held that the plaintiff's employment agreement, together with a collective bargaining agreement with plaintiff's union "that contain[ed] explicit provisions governing seamen's compensation," was "sufficient to satisfy the intent and requirements if not the letter" of section 10302. 873 F.2d 122, 126 (6th Cir. 1989). However, unlike the seaman in <u>Sylvis</u>, plaintiffs are not covered by any collective bargaining agreement. Under circumstances similar to those here, the Ninth Circuit expressly declined to follow <u>Sylvis</u> in strictly interpreting the provisions of a related admiralty statute requiring written employment agreements between fishermen and a vessel owner. <u>See Harper</u>, 278 F.3d at 976; <u>see also Doyle</u>, 301 F. Supp. 2d at 142-45

-10-

(rejecting defendants' argument that agreements with fishermen satisfied "both the language and spirit" of the statute). The Ninth Circuit further criticized <u>Sylvis</u> for failing to follow the Supreme Court's decision in <u>Griffin</u>, which strictly interpreted requirements in another admiralty statute. <u>See</u> <u>Harper</u>, 278 F.3d at 976; <u>see</u> <u>also</u> <u>Griffin v. Oceanic Contractors, Inc.</u>, 458 U.S. 564, 570 (1982) (interpreting predecessor to section 10313 which imposed double wage penalty); Thomas J. Schoenbaum, <u>Admiralty and Maritime Law</u> § 6-3 (4th ed.) (<u>Sylvis</u> conflicts "with the unqualified statutory requirement of articles of agreement"). Defendants' argument that plaintiff's employment agreements were the substantial equivalent of shipping articles not only is factually incorrect, but is contrary to the plain language of section 10302. <u>See</u> <u>Miller</u>, 530 U.S. at 337-338; <u>Griffin</u>, 458 U.S. at 570. Since I find that there is no genuine issue of material fact as to the defendants' failure to provide terms encompassed by the shipping articles required by section 10302, I conclude that defendants have violated this section.

    B.    <u>Violation of Section 8103(b)</u>

    Plaintiffs further base their claim under section 11107 on defendants' violations of section 8103(b) and 8701.

    Section 8103(b) requires that each unlicensed seaman be a United States citizen, an alien lawfully admitted to the United States for permanent residence or a foreign national enrolled in

the United States Merchant Marine Academy.  Cruz v. Chesapeake

Shipping, Inc., 932 F.2d 218, 220 (3d Cir. 1991); Nat'l Marine

Engineers' Beneficial Ass'n v. Burnley, 684 F. Supp. 6, 7 (D.D.C.

1988); 46 U.S.C. § 8103(b)(1) (2005) (amended 2006).  In response

to the undisputed fact that plaintiffs fit none of the above

categories, defendants make two strained arguments that the plain

language of section 8103(b) should be ignored.  First, defendants

contend that section 8103(b) must be read in conjunction with

section 8101(a) which provides that "[t]he certificate of

inspection . . . shall state the complement of licensed

individuals and crew (including boatmen) considered by the

Secretary to be necessary for safe operation."  See 46 U.S.C.

§ 8101(a).  Defendants argue that in light of section 8101, the

citizenship/alien requirement of section 8103(b) applies only to

those unlicensed seamen who are members of the crew required in

section 8101.  According to defendants, an owner is in violation

of section 8103(b) only if it employs a non-citizen to fulfill the

ship's complement as required under the certificate of inspection.

Defendants also contend that as members of the "riding crew,"[2]

---

[2] In 2006, a definition of "riding gang member" was added to
section 2101:

> [A]n individual who – (A) has not been issued a
> merchant mariner document under chapter 73; (B) does
> not perform – (I) watchstanding, automated engine room
> duty watch, or personnel safety functions; (ii) or
> cargo handling functions, including any activity
> relating to the loading or unloading of cargo, the
>                                           (continued...)

plaintiffs are not covered by section 8103(b).

"'[W]hen the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms.'" Dodd v. United States, 545 U.S. 353, 359 (2005) (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2001)).  As noted above, section 8103(b) expressly applies to all "unlicensed seamen."  See Cruz, 932 F.2d at 220 ("each unlicensed seaman [must] be a United States citizen or an alien lawfully admitted to the United States for permanent residence"); 46 U.S.C. § 8103(b).  A "seaman" is broadly defined as "an individual (except scientific personnel, a sailing school instructor, or a sailing school student) engaged or employed in any capacity on board a vessel."  46 U.S.C. § 10101(3).  Under this definition, cooks, stewards, waiters, cabin and kitchen helpers are seamen. See McDermott Int'l, Inc. v. Wilander, 498 U.S. 337 (1991); see also Doyle, 419 F.3d at 14 (statutory definition of "seaman" encompasses fishermen).  The statute does not exempt members of a

[2](...continued)
operation of cargo related equipment (whether or not
integral to the vessel), and the handling of mooring
lines on the dock when the vessel is let go; (C) does
not serve as part of the crew complement required under
section 8101; (D) is not a member of the steward's
department; and (E) is not a citizen or temporary
resident of a country designated as a sponsor of
terrorism.

46 U.S.C. § 2101(26a).

"riding crew" from that definition.[3]  Moreover, neither the

definition of a "seaman" nor section 8103 contains any reference

to section 8101 or the ship's complement.  Since it is undisputed

that plaintiffs do not fit any of the enumerated exceptions, I

conclude that plaintiffs are "seamen" under section 8101 and other

statutes in Title 46.

This interpretation is in accordance with the Marine Safety

Manual ("MSM"), "the primary policy and procedural statement for

the marine safety programs of the Coast Guard."  MSM, volume 1,

chapter 1 (Dodson Decl., Exh. I).  As noted in the MSM,

> the term 'seaman' is interpreted broadly by the Coast
> Guard to mean any individual engaged or employed in the
> business of a ship or a person whose efforts contribute
> to accomplishing the ship's business, whether that
> person is involved with the operation of the vessel. . .
> .  A crewmember may be a seaman although he or she is
> not occupying a position required by the Certificate of
> Inspection. . . .  [U]nder most circumstances,
> individuals being compensated for performing their jobs
> while the vessel is underway are considered seamen for
> the purpose of applying citizenship requirements. . . .
> [R]iding maintenance crews, and others employed in the
> business of the vessel are considered seamen.

See Dodson Decl., Exh. I.  While the Court is not bound by the

Coast Guard's interpretation, the Court should accord the MSM

respect to the extent it is persuasive.  See Christensen v. Harris

---

[3] Although the parties did not submit evidence as to the
work actually performed by the class members, the contracts of
the Polish seamen state that their duties included: "Deck and
Engine maintenance[;] Lashing and unlashing of cargo[; and]
Maintenance and cleaning of all accommodations."  See O'Neill
Decl., Exh. G.

County, 529 U.S. 576, 587 (2000); McCormick ex. rel. McCormick v. School Dist. of Mamaroneck, 370 F.3d 275, 293 n.14 (2d Cir. 2004) (Office for Civil Rights, Department of Education Investigator's Manual); United States v. City of New York, 359 F.3d 83, 93 & n.4 (2d Cir. 2004) (EEOC compliance manual); Mack v. Otis Elevator Co., 326 F.3d 116, 127 (2d Cir. 2003) (EEOC enforcement guidance). I find the MSM persuasive because it is consistent with the plain language of the statutes and provides a reasonable interpretation.

In support of their position, defendants point to an undated memorandum from Robert B. Ostrom, the Chief Counsel of the Maritime Administration, U.S. Department of Transportation. See Declaration of Walter Ziobro, Exh. C (ct. doc. 43 in Felskowski); Declaration of William G. Schubert, Exh. B (ct. doc. 76-3 in Dziennik). However, since the memorandum conflicts with the plain language of section 8103(b), it is not persuasive. See City of Chicago v. Environmental Defense Fund, 511 U.S. 328, 339 n.5 (1994) (rejecting EPA Administrator's memorandum in light of statutory language); Stewart Park & Reserve Coalition, Inc. v. Slater, 352 F.3d 545, 554 (2d Cir. 2003) (agency interpretation is entitled to deference only if it is not "at odds with the plain language of the statute itself") (quoting Lenoard F. v. Isr. Discount Bank of N.Y., 199 F.3d 99, 106 (2d Cir. 1999)). Defendants also submit the declaration of William Schubert, the former Maritime Administrator of the Maritime Administration,

echoing the views expressed in the memorandum.  See ct. doc. 76.
This declaration, likewise, is not entitled to deference.

In its original opposition brief filed in Felskowski,
defendants cited a bill passed by the House of Representatives in
2005 amending section 8103(b) to provide that the
alien/citizenship requirement does not apply to those "who are not
part of the crew complement required under section 8101 . . . and
do not perform watchstanding functions."  See H.R. 889.
Defendants also rely on the bill sponsor's statement for the
proposition that the amendment "reiterate[d] longstanding practice
and statutorily reaffirm[ed] that practice."  See ct. doc. 41 at 5
n.1 (filed in Felskowski).  The sponsor, Rep. Young, stated: "Mr.
Chairman, it is well established under current law that foreign
workers may work on U.S. flag vessels on international voyages to
conduct various non-watchstanding functions.  These personnel are
not considered seamen.  This amendment will confirm the legality
of this practice."  See id.

Congress subsequently enacted different legislation rather
than the House bill.  See Public Law No. 109-241, 120 Stat. 516.
Effective on July 11, 2006, the amendments to the shipping code
now provide that section 8103(b) does not apply to a "riding gang
member."  See 46 U.S.C. § 8103(j).  Instead, section 8106(a)(1)(A)
specifies that each riding gang member must be either a U.S.
citizen, lawful permanent resident or possess a temporary United

States nonimmigrant visa. <u>See</u> 46 U.S.C. § 8106(a)(1)(A). A

"riding gang member" is now defined, <u>inter</u> <u>alia</u>, as an individual

who does not perform "watchstanding, automated engine room duty

watch . . . [or] cargo handling functions." 46 U.S.C.

§ 2101(26a)(I), (ii). Each riding gang member must also undergo a

criminal background check and chemical testing and must be

identified on the vessel's crew list. <u>See</u> 46 U.S.C. § 8106(a)(2),

(3). Non-U.S. citizens or residents may be used only when U.S.

citizens or residents are unavailable to complete the work and may

not work more than 60 days in any calendar year. <u>See</u> 46 U.S.C.

§ 8106(c), (f). As enacted, the 2006 amendments provide for a far

more restrictive use of foreign riding gang members than the "long

standing practice" claimed by defendants.

Because Congress did not specify an effective date for these

amendments, they are deemed effective as of July 11, 2006, their

enactment date. <u>See</u> <u>Johnson v. United States</u>, 529 U.S. 694, 702

(2000) ("[W]hen a statute has no effective date, absent a clear

direction by Congress to the contrary, it takes effect on the date

of its enactment"). Although the amendments clearly do not apply

to this action, defendants continue to rely on Rep. Young's

statement as evidence that the new statute merely clarified

existing law. On the contrary, the Supreme Court has repeatedly

warned that, "the views of a subsequent Congress form a hazardous

basis for inferring the intent of an earlier one." <u>Consumer</u>

<u>Product Safety Comm'n v. GTE Sylvania</u>, 447 U.S. 102, 117-18
(1980); <u>United States v. Philadelphia Nat'l Bank</u>, 374 U.S. 321,
348-49 (1963); <u>United States v. Price</u>, 361 U.S. 304, 313 (1960);
<u>see</u> <u>also</u> <u>Sullivan v. Finkelstein</u>, 496 U.S. 617 (1990) (Scalia, J.,
concurring in part) ("Arguments based on subsequent legislative
history, like arguments based on antecedent futurity, should not
be taken seriously, not even in a footnote."). "[O]rdinarily even
the contemporaneous remarks of a single legislator who sponsors a
bill are not controlling in analyzing legislative history."
<u>Consumer Product</u>, 447 U.S. at 118. Moreover, the amendments
ultimately enacted by Congress contained far more restrictive and
comprehensive provisions regarding riding gang members than the
bill sponsored by Rep. Young. Thus, Rep. Young's statement is not
entitled to much weight. See <u>Consumer Product</u>, 447 U.S. at 118.

In addition, courts should presume that "statutes are usually
enacted to change existing law." <u>Wallace v. Jaffree</u>, 472 U.S. 38,
59 n.48 (1985); <u>Stone v. INS</u>, 514 U.S. 386, 397 (1995) ("When
Congress acts to amend a statute, we presume it intends its
amendment to have real and substantial effect"). One factor
courts consider in determining if an amendment clarifies, rather
than affects a substantive change to prior law, is whether a
conflict or ambiguity existed in the prior statute. See <u>Piamba
Cortes v. American Airlines, Inc.</u>, 177 F.3d 1272, 1283-84 (11th
Cir. 1999). Another factor is a declaration by Congress that its

intent was to clarify the prior enactment. See id. at 1284; ABKCO
Music, Inc. v. LaVere, 217 F.3d 684, 691 (9th Cir. 2000). Here,
as discussed above, there was no ambiguity in the language of the
statute prior to its recent amendments. Neither the language of
the statutory amendments nor the conference report indicate that
Congress intended to clarify rather than change existing law. See
Public Law No. 109-241, 120 Stat. 516; H.R. Conf. Rep. 109-413.
Thus, notwithstanding Rep. Young's floor statement, in the absence
of any persuasive indication to the contrary, I find that the 2006
amendments to the shipping code were intended to change the
existing law. To the extent they have any impact on my
interpretation of the prior statutory scheme, the changes only
confirm plaintiffs' interpretation.

In any event, even under the 2006 amendments, defendants
would not have been in compliance with the statute. Section
8106(c) now provides that the maximum number of days in any
calendar year that the owner or operator of a vessel may employ
foreign riding gang members is 60 days. See 46 U.S.C. § 8106(c).
All of the contracts submitted provide for periods of employment
far in excess of that limit. Moreover, plaintiff Felskowski's
time sheets indicate that he performed watchstanding functions
during his first period of employment and the contracts of
Felskowski and the named plaintiffs provide that "[l]ashing and
unlashing of cargo" are among their duties. See Mellusi Aff.,

Exh. F (Felskowski pay vouchers) (ct. doc. 21 in Felskowski);

O'Neill Decl., Exh. G.  Under the new definition in section 2101,

these plaintiffs cannot be "riding gang member[s]" if they

performed "watchstanding" functions or "cargo handling functions."

<u>See</u> 46 U.S.C. § 2101(26a)(B)(I), (ii).

Again relying on Mr. Schubert's declaration and citing <u>Alaska</u>
<u>Professional Hunters Ass'n Inc. v. FAA</u>, 177 F.3d 1030 (D.C. Cir.
1999), defendants further argue that the Coast Guard had a long
standing practice of permitting the use of foreign riding gangs on
U.S. flag vessels which became administrative common law.
However, the court in <u>Alaska Professional Hunters</u> held only that
advice that was uniformly given by agency officials to guide
pilots for almost thirty years and relied on by those pilots
became an authoritative departmental interpretation of its own
regulations.  177 F.3d at 1035.  Unlike those circumstances,
defendants have not established that the Coast Guard advised them
that their use of foreign riding gangs was lawful under the
relevant statutes.

Nor have defendants submitted any undisputed evidence that
the Coast Guard changed its interpretation of the law.  On the
contrary, the Marine Safety Manual and the exchange of letters in
2004 between Mr. Schubert and Admiral Thomas H. Collins, the
Commandant of the U.S. Coast Guard, reflect that the Coast Guard
did not change its position.  Admiral Collins not only disputed

Mr. Schubert's interpretation of the law, but stated that the prohibition of foreign riding maintenance gangs "has been the long-standing position of the Coast Guard," and that "Coast Guard policy properly implements the law and has been in place for decades."[4] Dodson Decl., Exh. F (Letter to Captain William G. Schubert from Thomas H. Collins dated December 22, 2004). Defendants also submitted a Memorandum of Understanding (the "MOU") entered between the U.S. Coast Guard and the Maritime Administration permitting the use of riding gangs on government owned vessels used by the United States Navy as part of the Military Sealift Command. Supplemental Declaration of William G. Schubert (ct. doc. 94) at ¶ 7, Exh. A (MOU). Since defendants do not claim that the vessels at issue in this case are part of the Military Sealift Command, the MOU is irrelevant and does not demonstrate that the Coast Guard had a policy of permitting the use of foreign riding gangs by commercial vessels. Even if the Coast Guard were inconsistent in enforcing its prohibition on the use of foreign riding gangs those practices would not change what the law is. Inconsistent enforcement goes only to the deference

---

[4] Admiral Collins also points out in his letter that the Coast Guard had requested changes to section 8701 so that "certain shipboard individuals, specifically housekeeping, gaming, and entertainment personnel would not be required to have merchant mariner documents." Yet, Congress severely narrowed the Coast Guard's request in "refus[ing] to grant extensive exceptions to the requirements for U.S. vessels to be manned by U.S. citizens or permanent residents holding merchant mariner documents." Dodson Decl., Exh. F.

accorded to an agency's interpretation of the law.  See Good
Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993).

In sum, defendants' evidence, at most, shows a difference in
views regarding maritime practices prior to the passage of the
2006 amendments and the history and the amendment do little to
disprove the violation of section 8103(b).

C.   Violation of section 8701

Section 8701 requires that every "individual" serving on
board a merchant vessel have a merchant mariner document.  A
merchant mariner document is issued by the Coast Guard to serve as
a certificate of identification and service specifying each rating
in which the holder is qualified to serve.  The document must
contain the signature, nationality, age, photograph, physical
description and home address of the seaman.  46 U.S.C. §§ 7302,
7303.   It is undisputed that plaintiffs did not have merchant
mariner documents and the employment contracts do not contain all
of the information that would be contained in merchant mariner
documents.  Nonetheless, defendants make the same arguments as to
section 8701 as to section 8103.  The analysis above is equally
applicable here: under the plain language of the statute, the
requirements of section 8701 apply to plaintiffs as they are
"individual[s] serving on board a vessel."  Thus, I find that
defendants have also violated section 8701.

D.  Private Right of Action

Defendants contend that violations of sections 8103(b), 8701 and 10302 do not create a private right of action.  This argument is misplaced since plaintiffs bring their claim under section 11107, which expressly provides a remedy for a seaman who is employed "contrary to the laws of the United States."  Section 11107 "entitle[s] all seamen engaged contrary to the provisions of *any act of Congress* . . . to recover either his promised wages or the highest rate of wages of a seaman of comparable rating at the port from which he was engaged, whichever is higher."  Doyle v. Huntress, Inc., 419 F.3d 3, 9, 13 (1st Cir. 2005) (emphasis added); see also TCW, 129 F.3d at 1333-34 (applying remedy of section 11107 to violation under section 10601).  Thus, while violations of sections 8103, 8701 or 10302 may provide a basis for liability, section 11107 provides the remedy.  See Doyle, 419 F.3d at 14 ("Section 10601 is a liability section and § 11107 is tied to § 10601 as a remedial provision"); TCW, 129 F.3d at 1333-34; see also The Law of Seamen § 6.10 ("All shipments of seamen made contrary to the acts of Congress, as shipping without articles on a foreign voyage, are void, and . . . the seamen are entitled to recover the highest rate of wages of the port from which they were shipped or the amount agreed to be given them at their shipment").  As long as plaintiffs prove a violation of section 8103 or another maritime statute affecting seamen, they are entitled to recovery

under section 11107.  See Doyle, 419 F.3d at 14; TCW, 129 F.3d at 1334; Gary v. D. Agustini & Assocs., 865 F. Supp. 818, 823 n.3 (S.D. Fla. 1994) (suggesting that seaman could predicate suit on section 11107 claiming violation of section 10314 despite finding no private right of action under section 10314).

Defendants further argue that since the statutes provide for a civil penalty, they could not also serve as the basis for a private right of action.  However, none of the cases cited by defendants address claims brought under section 11107.  See Zbylut v. Harvey's Iowa Mgmt. Co. Inc., 250 F. Supp. 2d 1104 (S.D. Iowa 2003); Meaige v. Hartley Marine Corp., 925 F.2d 700 (4th Cir. 1991); Feemster v. BJ-Titan Servs., Co., 873 F.2d 91 (5th Cir. 1989).  Defendant's argument is also contrary to the plain language of section 11107 which provides a remedy for any seamen engaged "contrary to a law of the United States."  "[L]egislation for the benefit of seamen is to be construed liberally in their favor."  McMahon v. United States, 342 U.S. 25, 27 (1951); see Isbrandtsen Co. v. Johnson, 343 U.S. 779, 782 (1952).

Having found that defendants' employment of plaintiffs was in violation of sections 10302, 8103(b) and 8701, this Court also finds that plaintiffs have established that section 11107 applies to their claims.  I therefore recommend that the Court grant this aspect of plaintiffs' motion for summary judgment.

II. <u>Application of Section 10313</u>

Plaintiffs also seek to recover the double wage penalty imposed by section 10313.  Section 10313 provides:

> At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier. . . .  When payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.

46 U.S.C. § 10313(f), (g).

The double wage penalty is not imposed where payment is withheld in good faith under a reasonable belief that it is not due, where there is a bona fide dispute as to the amount owed, or where there has been an honest error of judgment in this regard. <u>Vinieris v. Byzantine Maritime Corp.</u>, 731 F.2d 1061, 1063-64 (2d Cir. 1984).  Rather, in order to recover under this section, "there ha[s] to be a showing of 'conscious misconduct' on the part of the ship's Captain, which was arbitrary, unwarranted, unreasonable, unjust and willful." <u>See</u> <u>id.</u> at 1064.  The employer bears the burden of demonstrating the sufficiency of the cause of the withholding.  <u>See</u> <u>Chretien v. Exxon, U.S.A.</u>, 701 F. Supp. 266, 270 (D.N.H. 1988), <u>aff'd</u>, 863 F.2d 182 (1st Cir. 1988).

Defendants argue that section 10313's double wage penalty is inapplicable here, <u>inter</u> <u>alia</u>, because thier failure to pay plaintiff the wages due him within the time allotted was not "without sufficient cause."  Again, defendants argue that the

-25-

maritime industry has followed the custom of employing foreign
riding crews without regard to the riding crews' citizenship
status and without merchant mariner documents and that the Coast
Guard has condoned this practice for decades.  Accordingly,
defendants claim that they "relied on long-standing industry
practice concerning riding crews, the Coast Guard's condoning of
that practice, and the position of the Maritime Administration
concerning riding crews in employing [plaintiffs] as [] riding
crew member[s]."[5]  Raggio Decl. at ¶ 33 (ct. doc. 42  in
Felskowski).  Defendants further contend that prior to instituting
the instant suit, plaintiffs never complained about their wages or
terms of employment and were paid the entire amounts provided for
in their employment contracts.

On the other hand, plaintiffs submit some evidence of
defendants' awareness of statutory requirements.  Plaintiff
Felskowski's pay records maintained on board the M/V Ascension
(Mellusi Aff., Exh. F) and many of the employment contracts of the
Filipino class members (Dodson Decl., Exhibit B) refer to

---

[5] Mr. Raggio states in his affidavit that the defendants
relied on "the position of the Maritime Administration concerning
riding crews in employing Mr. Felskowski as a riding crew
member."  However, the Maritime Administration memorandum
submitted by defendants was written in August or September of
2004, see Ziobro Decl. at ¶ 13, more than five years after Mr.
Felskowski's first period of employment.  Most of the other class
members also started working for defendants long before the
creation of the memorandum.  See O'Neill Decl., Exh. G;
Supplemental O'Neill Decl., Exh. A; Cruz Decl., Exh. A; Supp.
Cruz Decl., Exh. A; Dodson Decl., Exh. B.

plaintiffs as "sailing school students." Yet, it is undisputed that defendants do not operate a sailing school, see Mellusi Aff., Exh. K at 29 (deposition testimony of James G. Hannon), and that the Sealift vessels are not "sailing school vessels." See also 46 U.S.C. § 2101(30) (definition of "sailing school vessel"). Plaintiffs argue that this demonstrates defendants' conscious attempt to evade the law since, as noted above, the shipping code exempts "sailing school students" from the statutory protections of "seamen." See 46 U.S.C. § 10101(3).

This Court agrees that plaintiffs have submitted some evidence of defendants' willful misconduct. However, defendants raise material issues of fact as to whether they reasonably relied on the alleged longstanding industry practice of employing foreign workers. See Williams v. Wilmington Trust Co., 345 F.3d 128, 132 (2d Cir. 2003) ("where the employer deliberately relies on a reasonable, but ultimately wrong, legal argument to withhold payment, it is not subject to the wage penalty"). Although I do not agree with defendants' interpretation of the relevant statutes, plaintiffs have not unequivocally demonstrated that defendants' actions are a result of conscious misconduct rather than a good faith error of judgment. A defendant's state of mind and good faith are ordinarily questions best addressed at trial. See EMI Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos Inc., 228 F.3d 56, 67-68 (2d Cir. 2000); Sports Auth., Inc. v.

-27-

Prime Hospitality Corp., 89 F.3d 955, 964 (2d Cir. 1996).

Relatedly, as to defendant's violation of section 10302, defendants again claim that they merely followed industry practice in not requiring foreign riding crew members to sign formal shipping articles. Raggio Aff. at ¶ 27. Although defendant did not execute formal shipping articles with plaintiffs as required by section 10302, the employment contracts between the parties included some of the requirements of formal shipping articles. Thus, defendants have raised an issue of fact as to willfulness.

## III. Recovery Under Both Sections 11107 and 10313

Defendants argue that recovery under both section 11107 and 10313 would constitute an illegal "penalty on a penalty." However, section 11107 is "better characterized as merely providing a statutory default to prevailing market wage in the case of an invalid contract. See Harper, 278 F.3d at 977 (distinguishing characterization in Seattle-First Nat'l Bank v. Conaway, 98 F.3d 1195, 1198 (9th Cir. 1996)); Flores, 335 F.3d at 912; Doyle, 301 F Supp.2d at 146. Rather than being punitive, the remedy provided by section 11107, "merely gives what is due." Seattle-First Nat'l Bank v. Laydy Lynne, No. A92-0633 CIV, 1995 WL 464536, at *4 n.10 (D. Alaska 1995) (viewing section 11107 as "remedial" rather than "punitive"). In fact, courts in the Ninth Circuit have permitted recovery under both section 11107 and a Washington state wage penalty statute similar to section 10313

-28-

that provides for double damages.  See Maughan v. Tracey Anne, Inc., 141 F.3d 1177 (9th Cir. 1998); Gruver v. Lesman Fisheries, Inc., 409 F. Supp. 2d 1263 (W.D. Wash. 2005); see also Kossick v. United Fruit Co., 365 U.S. 731, 735 n.4 (1961) ("In our law the seaman who ships without articles can recover the highest wages paid at the port of embarkation, as well as subjecting the master who took him on board to penalties").  The application of both statutes to plaintiffs' claims is not unfair to defendants as a double penalty.[6]  Indeed, the aim of the federal penalty wage statute is to "protect seamen from the harsh consequences of arbitrary and unscrupulous actions of their employers" and to deter such actions.  See Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 572 (1982); American Foreign S.S. Co. v. Matise, 423 U.S. 150, 160 (1975); Collie v. Fergusson, 281 U.S. 52, 55 (1930).  Accordingly, the penalty wage statute "must be liberally interpreted for their benefit."  Forster v. Oro Navigation Co., 228 F.2d 319, 319-20 (2d Cir. 1955).  Thus, plaintiffs are not precluded from seeking damages under both section 11107 and section 10313 by virtue of a double penalty.

---

[6] The statute involved in the case cited by defendants is inapposite since it essentially provided for liquidated damages for breach of contract.  See Lewis v. Texaco, Inc., 1975 AMC 61 (S.D.N.Y. 1974), aff'd, 527 F.2d 921 (2d Cir. 1975).

IV.   Issues Relating Only to Plaintiff Felskowski

    A.    Violation of Section 8101

    Plaintiff Felskowski also moves for partial summary judgment
on claims based on violations of 46 U.S.C. § 8101, which prohibits
operation of a vessel without having the complement of crew
required in the vessel's Certificate of Inspection.  However, this
claim was raised for the first time in plaintiff's reply brief and
was not pled in either his original or amended complaints.
Although a complaint need not plead the legal theory supporting a
claim, plaintiff must set forth facts that will provide defendants
"fair notice of what the plaintiff's claim is and the grounds upon
which it rests."  Conley v. Gibson, 355 U.S. 41, 47 (1957); Wynder
v. McMahon, 360 F.3d 73, 77 (2d Cir. 2004).  Plaintiff's complaint
does not discuss the complement of crew required.  "A motion for
summary judgment is not the appropriate place to present new
claims which effectively amend the complaint."  Weber v. Paduano,
2003 WL 2280177, at *15 (S.D.N.Y. 2003); Allen v. West-Point-
Pepperell, Inc., 908 F. Supp. 1209, 1224 (S.D.N.Y. 1995); see also
New York City Environmental Justice Alliance v. Giuliani, 214 F.3d
65, 67 n.2 (2d Cir. 2000).  Therefore, I recommend denying summary
judgment on Felskowski's claim concerning a violation of section
8101.

B.  <u>Laches Defense</u>

Defendants argue that plaintiff Felkowski's federal wage claims are barred by the equitable doctrine of laches.  In admiralty actions, the doctrine of laches governs the timeliness of an action.  <u>See</u> <u>DeSilvio v. Prudential Lines</u>, 701 F.2d 13, 15 (2d Cir. 1983); <u>Hill v. W. Bruns & Co.</u>, 498 F.2d 565, 568 (2d Cir. 1974); <u>Guenther v. Sedco, Inc.</u>, No. 93 Civ. 4143, 1998 WL 898349, at *3 (S.D.N.Y. Aug. 20, 1998).  When applying the doctrine of laches in this context, a court considers (1) whether there was a "satisfactory excuse for the delay in bringing the action;" (2) whether the delay will result in unfair prejudice to the defendant; and (3) the analogous statute of limitations. <u>DeSilvio</u>, 701 F.2d at 15; <u>Guenther</u>, 1998 WL 898349, at *3-*4. "'[W]hen the suit has been brought after the expiration of the state limitation period, a court applying maritime law asks why the case should be allowed to proceed; when the suit, although perhaps long delayed, has nevertheless been brought within the state limitation period, the court asks why it should not be.'" <u>DeSilvio</u>, 701 F.2d at 16 (quoting <u>Larios v. Victory Carriers, Inc.</u>, 316 F.2d 63, 66 (2d Cir. 1963)); <u>see</u> <u>Conopco, Inc. v. Campbell Soup Co.</u>, 95 F.3d 187, 191 (2d Cir. 1996).

To determine the applicable statute of limitations, the Supreme Court generally borrows the most closely analogous state limitations period.  <u>See</u> <u>Graham County Soil & Water Conservation</u>

Dist. v. United States, 545 U.S. 409, 417 (2005); North Star Steel Co. v. Thomas, 515 U.S. 29, 33-34 (1995). Only in "rare case[s]" has the Court borrowed an analogous federal limitations period. See Graham, 545 U.S. at 415. Since the presumption that state law supplies the missing federal limitations period is "longstanding" and "settled," it is presumed that when Congress enacts legislation, it expects that the courts will borrow from state law. North Star, 515 U.S. at 34-35. A "narrow" exception to the general rule permits reference to federal law only when it "'clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." Id. at 35 (quoting Reed v. United Transp. Union, 488 U.S. 319, 324 (1989)); Manning v. Utilities Mut. Ins. Co., 254 F.3d 387, 394 (2d Cir. 2001).

Despite my invitations for them to do so, the parties have not adequately briefed the facts necessary to determine what state's law would apply here, let alone discuss the applicable state laws, including New York's borrowing statute. In any event, the parties have not presented any evidence as to when plaintiff knew that his engagement was contrary to U.S. law nor the prejudice suffered by defendants as a result of any delay. Absent briefing on the choice of law issue, this Court cannot determine which party bears the burden of proof on the doctrine of laches.

Since the issue of laches is not appropriate for summary judgment at this juncture, I recommend that there be no disposition of any motion based on laches at this time.

## V.  Defendants' Motion to Compel Arbitration

Defendants move to compel arbitration or dismiss the claims of the Filipino plaintiffs on the grounds that their employment agreements require that any disputes with defendants be arbitrated in the Philippines under Philippine law.  Plaintiffs contest both the legal and factual bases for the motion.

Pursuant to the Federal Arbitration Act ("FAA"), which incorporates the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), 9 U.S.C. §§ 201-08, et seq., a court "may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States."  9 U.S.C. § 206.  An arbitration agreement falls under the Convention and the FAA if: "(1) there is a written agreement;[7] (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope." U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241

---

[7] The defendants' authority to rely on the arbitration clause depends on the relationships between defendants and the signatory to the employment contracts, Magsaysay Maritime Corp. ("MMC").  See Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd., 186 F.3d 210, 218 (2d Cir. 1999).

F.3d 135 (2d Cir. 2001).

"Arbitration clauses must be clear and unequivocal."
Standard Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 446 (3d
Cir. 2003); see Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 106
(3d Cir. 2000) ("Before a party to a lawsuit can be ordered to
arbitrate and thus be deprived of a day in court, there should be
an express, unequivocal agreement to that effect."). "Arbitration
is a matter of contract and a party cannot be required to submit
to arbitration any dispute which he has not agreed to so submit."
Howsam, 537 U.S. at 83; AT&T Tech., 475 U.S. at 648; Steelworkers,
363 U.S. at 582. Although federal law strongly favors
arbitration, "the law still requires that parties actually agree
to arbitration before it will order them to arbitrate a dispute."
Opals on Ice Lingerie v. Bodylines Inc., 320 F.3d 362, 369 (2d
Cir. 2003). The presumption in favor of arbitrability arises only
after it has been established that an agreement to arbitrate
exists and the question is whether a particular dispute is within
the scope of the already established agreement to arbitrate. See
First Options, Inc. v. Kaplan, 514 U.S. 938, 943-45 (1995); see
also Bell Atlantic Corp. v. CTC Communications Co., 159 F.3d 1345
(2d Cir. 1998). If there is a genuine issue of fact as to whether
the non-moving party agreed to arbitrate, arbitration cannot be
compelled. See Denney v. BDO Seidman, L.L.P., 412 F.3d 58 (2d
Cir. 2005).

In determining whether the parties agreed to arbitrate, ordinary contract principles apply. See First Options, 514 U.S. at 943-44; PaineWebber, Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996). Under the common law rule, "in order to uphold the validity of terms incorporated by reference it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." PaineWebber, 81 F.3d at 1201. Accordingly, "the paper to be incorporated into a written instrument by reference must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt." Id. Thus, "a party will not be bound to the terms of any document unless it is clearly identified in the agreement." Id. Further, "a court should construe ambiguous language against the interest of the party who drafted it." Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995) (interpreting arbitration clause); see Bell Atlantic Corp. v. CTC Communs. Corp., 159 F.3d 1345 (2d Cir. 1998).

As previously discussed, based on this Court's review, the vast majority of the contracts produced by defendants are three versions of a one page form contract. See Supp. Cruz Aff., Exh. 1; Dodson Decl., Exh. B (ct. docs. 83-2, 108-2). Interpreting one version, defendants argue that the arbitration provision is incorporated by reference in paragraph 2 of the contract. See Dodson Decl., Exh. 3 to Exh. B. Paragraph two of that employment

contract states that its terms and conditions will be observed "in accordance with Department Order No. 4 and Memorandum Circular No. 9." This reference is apparently to the Philippines Department of Labor and Employment's promulgation of "Department Order No. 4," which contains amendments to the "Standard Terms and Conditions Governing the Employment of Filipino Seafarers On Board Ocean-Going Vessels" ("POEA Standard Terms and Conditions"). The Philippine Overseas Employment Administration distributed the POEA Standard Terms and Conditions through a document entitled, "Memorandum Circular No. 9." The POEA Standard Terms and Conditions, Section 29, titled "Dispute Settlement Procedures," requires arbitration for parties not covered by a collective bargaining agreement:

> [i]n cases of claims and disputes arising from [seafaring] employment, . . . the parties may at their option submit the claim or dispute to either the original and exclusive jurisdiction of the National Labor Relations Commission (NLRC), pursuant to Republic Act (RA) 0042 otherwise known as the Migrant Workers and Overseas Fillipinos Act of 1995 or to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators.

See ct. doc. 108-2 at 8. Section 31 of the POEA Standard Terms and Conditions, titled "Applicable Law," provides that "[a]ny unresolved dispute, claim or grievance arising out of or in connection with this Contract, including the annexes thereof, shall be governed by the laws of the Republic of Philippines, international conventions, treaties and covenants where the

-36-

Philippines is a signatory." _Id._

Defendants do not explain how the arbitration clause is incorporated into a second and different version of the one page contract. _See_ Dodson Decl., Exh. 2 to Exh. B. Paragraph 2 of this form states that "[t]he terms and conditions of the revised Employment Contract governing the employment of all seafarers approved per Department Order No. 33 and memorandum Circular No. 55 both Series of 1996 shall be strictly and faithfully observed." Paragraph 3 of that contract states that "[a]ny alterations or changes, in any part of this Contract shall be evaluated, verified, processed and approved by the Philippine Overseas Employment Administration (POEA). Upon approval, the same shall be deemed an integral part of the Standard Employment Contract (SEC) for seafarers." However, defendants have not produced any document entitled, "Standard Employment Contract (SEC) for seafarers."

In yet a third version of the one page employment contract, there is no provision that even arguably incorporates the terms of another agreement. _See_ Dodson Decl., Exh. 1 to Exh. B. In only 8 of the 94 contracts produced by defendants, the POEA Standard Terms and Conditions is attached to the one page contract and signed by the seaman. _Id._, Exh. B.

In other words, as discussed above, in only one version of the one page employment contract are the terms of "Department

Order No. 4" and "Memorandum Circular No. 9" incorporated by reference. See Dodson Decl., Exh. 3 to Exh. B. Those two documents, in turn, incorporate the POEA Standard Terms and Conditions. The POEA Standard Terms and Conditions is a 10 page document containing 33 sections, one of which contains the arbitration clause. See Cruz Decl., Exh. B. As to the other two versions of the contract, defendants do not explain where the POEA Standard Terms and Conditions are incorporated by reference. See Dodson Decl., Exhs. 1 and 2 to Exh. B. None of the three versions mention arbitration nor incorporate the POEA Standard Terms and Conditions by name. Defendants submit the affidavit of Maria Valentina Cruz, the Corporate Secretary of Magsaysay Maritime Corporation ("MMC"), Sealift, Inc.'s employment agent in an attempt to show that the POEA Standard Terms are applicable. Ms. Cruz states that it is "standard MMC company procedure to have every Filipino seafarer execute these Standard Terms prior to employment with an overseas employer" and she attaches "a representative sample of the signed Standard Term and Conditions." However, her affidavit is belied by defendants' failure to produce any more than 8 of the signed POEA Standard Terms and Conditions.[8]

_____

[8] Defendants' argument that plaintiffs are estopped from denying that they are bound by the POEA Standard Terms and Conditions because the Philippines government requires that employers obtain their seamen's signatures is circular. Under that reasoning, there would be no incentive for employers to reveal the terms of the agreement to their employees because they could simply claim the employees are estopped from denying that
(continued...)

Given the failure of the defendants to identify the document that is purportedly incorporated by reference or to mention arbitration and in light of the issue of fact as to whether the POEA Standard Terms and Conditions were provided to the vast majority of the seamen, I find that defendants have not established that there is a written agreement to arbitrate with respect to all of the contracts signed with potential class members. See Angeles v. Norwegian Cruise Lines, Inc., No. 01 CV 9441, 2002 WL 1997898, at *4-*5 (S.D.N.Y. Aug. 29, 2002) (denying employer's summary judgment motion because fact issue existed as to whether POEA Standard Terms and Conditions was reasonably communicated to employee).

Moreover, "[t]he legal effect of a forum-selection clause depends in the first instance upon whether its existence was reasonably communicated to the plaintiff." Effron v. Sun Cruise Lines, Inc., 67 F.3d 7, 9 (2d Cir. 1995). A foreign arbitration provision is a subset of forum selection clauses. See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 533 (1995). Defendant has not established that the existence of the arbitration clause in the POEA Standard Terms and Conditions was reasonably communicated to plaintiffs, none of whom are sophisticated businessmen. This result is particularly appropriate in this case, where it is unlikely that the seamen

---

[8](...continued)
they are bound.

were aware that they might forfeit their rights to statutory remedies under U.S. law. Cf. Mastrobuono, 514 U.S. at 62 (in holding that plaintiffs did not agree to foreclose claims for punitive damages in arbitration clause: "it seems unlikely that [plaintiffs] . . . had any idea that by signing a standard form agreement to arbitrate disputes they might be giving up an important substantive right").

As to the few potential plaintiffs who, as defendants have adequately demonstrated, did execute a copy of the POEA Standard Terms and Conditions, I find that the arbitration clause is unenforceable as against the statutory wage claims being asserted here, as Judge Irizarry intimated in her order granting class certification. See ct. doc. 58 at 8-9.[9] Forum selection clauses are "prima facie valid" absent a clear showing of unreasonableness, unjustness, overreaching or fraud. See The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 9-10 (1972). Such a clause is unreasonable when "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." Id. at 15. Similarly, the Convention permits a court to refuse enforcement of an arbitral award if "[t]he recognition or enforcement of the award would be contrary to the public policy of that country."

---

[9] For purposes of this discussion, I will assume that the four requirements for the application of the Convention and the FAA are met.

Convention, art. V, § 2(b).

As discussed above, section 10313 provides a statutory remedy for unpaid wages.  The statute explicitly states that "[t]he courts are available to the [foreign] seaman for the enforcement of this section."  46 U.S.C. § 10313(I); Defs.' Reply Br. at 5 n.3.  In addition, section 10317 states:

> A master or seaman by any agreement other than one provided for in this chapter may not forfeit the master's or seaman's lien on the vessel or be deprived of a remedy to which the master or seaman otherwise would be entitled for the recovery of wages.  A stipulation in an agreement inconsistent with this chapter, or a stipulation by which a seaman consents to abandon a right to wages if the vessel is lost, or to abandon a right the seaman may have or obtain in the nature of salvage, is void.

46 U.S.C. § 10317.

In U.S. Bulk Carriers, Inc. v. Arguelles, 400 U.S. 351 (1971), the Supreme Court affirmed the refusal to enforce an arbitration clause in a collective bargaining agreement regarding a seaman's claim for unpaid wages.[10]  The Court found that enforcement of a compulsory arbitration clause under the Labor Management Relations Act ("LMRA") was in "literal conflict" with the seaman's express statutory right to bring suit in federal court which must be resolved in the seaman's favor given the special status of seamen as wards of admiralty.  The Court

---

[10] The seaman's wage statute involved in Arguelles was the predecessor to section 10313, sections 596 and 597, which provided the same remedies.

rejected the argument that the LMRA superceded a seaman's right to sue in federal court under the wage statute.

The Dziennik action provides an even more compelling case for preserving a seaman's statutory right to bring wage claims. In Arquelles, the plaintiff's claims for unpaid wages were based on the interpretation and application of the terms of a collective bargaining agreement between his labor union and his employer. 400 U.S. at 351-52. Since Arquelles involved a collective bargaining agreement rather than an individual contract,[11] the pertinent seaman's rights in that case were protected by his union and the collective bargaining agreement. Moreover, since Arquelles's claims for wages were based on an interpretation of the collective bargaining agreement, the dispute was well suited for a grievance process under the terms of that agreement. In contrast, plaintiffs here have no protection based on union representation. Cf. Rogers v. Royal Carribean Cruise Lines, No. CV 06-4574, 2007 U.S. Dist. LEXIS 89088, at *20 (C.D. Cal. Jan. 25, 2007) (in enforcing arbitration agreement in collective bargaining agreement, relying on role of "unions [to] protect the

---

[11] Although the Second Circuit has distinguished between the waiver of statutory rights through arbitration clauses in individual contracts and arbitration clauses in collective bargaining agreements, see Pyett v. Pennsylvania Bldg. Co., 498 F.3d 88, 92-93 & n.3 (2d Cir. 2007), the Arquelles Court was clearly concerned with the seaman's relationship with his employer rather than any conflict of interest between the seaman and his union.

interests of seamen through collective bargaining and grievance procedures"), aff'd, 547 F.3d 1148 (9ᵗʰ Cir. 2008). Also, unlike Arquelles, the claims asserted here are entirely based on federal statutes and do not involve interpretation of the terms of the plaintiffs' employment contracts.

Critically, plaintiffs here would not have an opportunity to assert their statutory wage claims in the arbitration process conducted under Philippine law. The dissenting circuit judge in Arquelles conceded that he would not have required arbitration if the plaintiff's claims were entirely statutory or if there were no other means to assert the statutory claims. See Arquelles v. U.S. Bulk Carriers, Inc., 408 F.2d 1065, 1072 n.2 (4ᵗʰ Cir. 1969) (Haynsworth, J., dissenting).

Defendants rely on Lobo v. Celebrity Cruises, Inc., 488 F.3d 891 (11ᵗʰ Cir. 2007), in which the Eleventh Circuit declined to follow Arquelles, in part, because of its view that the Supreme Court did not have the opportunity to consider the Convention, for which Congress passed implementing legislation only a few weeks before the decision was issued. The Eleventh Circuit thus held that the seaman's wage statute was superceded by the Convention which required enforcement of an arbitration clause. See also Rogers v. Royal Carribean Cruise Lines, 547 F.3d 1148 (9ᵗʰ Cir. 2008) (involving collective bargaining agreement and following Lobo). Nonetheless, Arquelles remains good law and many courts in

this and other circuits have cited the opinion without questioning its vitality.  <u>See, e.g.</u>, <u>Larkins v. Hudson Waterways Corp.</u>, 640 F.2d 997 (9th Cir. 1981) ("It is clear that a shipowner may not in any way circumvent section [10313] by private agreement."); <u>Mateo v. M/S Kiso</u>, 805 F. Supp. 761, 777 (N.D. Cal. 1991) ("It is well established that a seamen's contractual obligation to arbitrate wage claims cannot abrogate his statutory right to resolve wage claims under the applicable statutory rules in federal court."); <u>Kornis v. Sealand Servs.</u>, <u>Inc.</u>, 490 F. Supp. 418, 420 (S.D.N.Y. 1980) ("seaman may sue for wages . . . [under 46 U.S.C. § 10313] . . . without first exhausting any contractual dispute resolution procedures").

Further, the application of <u>Arquelles</u> to this case is entirely consistent with the reasoning of subsequent Supreme Court opinions.  Indeed, even where the Supreme Court has enforced forum selection and arbitration clauses, it has expressly recognized that in certain circumstances, such clauses would operate as unenforceable waivers of a party's right to pursue statutory remedies.  In <u>Carnival Cruise v. Schute</u>, 499 U.S. 585 (1991), the Court upheld a forum selection clause in a form contract printed by a cruise line on a passenger ticket.  The plaintiffs had argued that the forum selection clause was unenforceable as violating 46 U.S.C. § 183c which prohibits any passenger carriage contract from removing a claimant's right to a trial by a "court of competent

jurisdiction" for personal injury due to negligence. The Court reasoned that since the forum selection clause provided for actions to be brought in the courts of Florida, it did not take away plaintiffs' right to a trial. Importantly, however, the Court noted that the result would be different had the forum selection clause required arbitration, which would have denied the plaintiff a right to "judicial resolution of claims against petitioner." 499 U.S. at 596.

In Mitsubishi Motors Corp. v. Soler Chrysler-Plymounth, Inc., 473 U.S. 614 (1985), the Court held that a party could enforce an arbitration agreement even though some of the claims at issue arose under the federal antitrust statutes. However, the Court recognized that despite the federal policy in favor of arbitration embodied by the FAA and the Convention, "all controversies implicating statutory rights are [not] suitable for arbitration." 473 U.S. at 627. Where Congress has "evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue," that "intention will be deducible from text or legislative history."[12] Id. at 627. Moreover, the Court recognized that "in

_____

[12] The Court later made clear that the burden of establishing that Congress intended to preclude waiver of a judicial forum is on the party seeking to avoid arbitration in holding that arbitration could be compelled with respect to an individual employee's claim brought under the Age Discrimination in Employment Act of 1967 ("ADEA"). See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 27 (1991) (if intention to preclude waiver of judicial forum "exists, it will be discoverable in the text of the ADEA, its legislative history,
(continued...)

the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." Id. at 637 n.19.; see also Central Nat'l-Gottesman, Inc. v. M.V. "Gertrude Oldendorff," 204 F. Supp. 2d 675, 679 (S.D.N.Y. 2002) (holding that foreign selection clause in bill of lading was unenforceable as depriving plaintiff of its statutory rights under Carriage of Goods by Sea Act).

The texts of sections 10313 and 10317 clearly evidence congressional intent to afford seamen a judicial remedy for statutory wage claims and to preclude a contractual waiver of their rights to seek that remedy. Indeed, Congress could hardly have been more explicit than stating "[t]he courts are available to the seaman for the enforcement of this section." 46 U.S.C. § 10313(I). The Second Circuit has accordingly entertained cases brought by seamen claiming violation of wage statutes. See Monteiro v. Sociedad Maritima San Nicolas, S.A., 280 F.2d 568 (2d Cir. 1960) (refusing to decline jurisdiction over foreign seaman's wage act claim because of statute's text requiring mandatory jurisdiction); Glandzis v. Callinicos, 140 F.2d 111 (2d Cir. 1944) (arbitration clause in seaman's agreement was void under seaman's

_____

[12](...continued)
or an 'inherent conflict' between arbitration and the ADEA's underlying purposes"). As discussed below, this burden has been met.

-46-

wage statute); see also Kanagaratnam v. Vialogro Compania Naviera, S.A., 1984 WL 735, at *4 (S.D.N.Y. Aug. 6, 1984) (denying forum non conveniens motion regarding seaman wage act claims). In addition, section 10317 expressly prohibits any agreement that would deprive a seaman of a right to his statutory remedy.

Congressional intent to preserve these statutory rights is also consistent with the seaman's unique status as a ward of admiralty and the purposes of the wage statutes. The purpose of section 10313 is "to secure prompt payment of seaman's wages . . . and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed." Griffin, 458 U.S. at 572. As a result, the seaman's wage statutes have been liberally construed in favor of seamen. See Isbrandtsen Co. v. Johnson, 343 U.S. 779, 781 (1952) ("Whenever congressional legislation in aid of seamen has been considered here, since 1872, the Court has emphasized that such legislation is largely remedial and calls for liberal interpretation in favor of seamen").

Moreover, unlike the statutory claims at issue in Mitsubishi Motors and Gilmer, enforcing the arbitration clause here would not only deprive plaintiffs of a judicial remedy, but would deny the seamen their rights to assert their wage claims under the statute. It is undisputed that plaintiffs would be unable to bring their statutory wage claims in the arbitration proceedings required by

the agreements.[13]   Thus, were the Court to apply the forum

selection clause compelling arbitration in the Philippines and the

choice of law clause mandating the application of Philippine law,

this would improperly "operate as a prospective waiver" of the

plaintiffs right to pursue their statutory remedies.   <u>See</u>

<u>Mitsubishi Motors</u>, 473 U.S. at 637 n.19; <u>see also</u> <u>Vimar Seguros Y</u>

<u>Reaseguros, S.A. v. MV Sky Reefer</u>, 515 U.S. 528, 540 (1995).   In

sum, I find that the arbitration clause at issue is unenforceable

as against public policy.

CONCLUSION

For the foregoing reasons, I respectfully recommend that

plaintiffs' motion for partial summary judgment be granted as

discussed above as to their claims under section 11107 for

violation of sections 10302, 8103(b) and 8701 and denied in all

other respects.   I further recommend that defendants' motions for

summary judgment and to compel arbitration or to dismiss be

denied.

This Report and Recommendation will be electronically filed

on this date.   Any objections to this Report and Recommendation

---

[13] The parties raise in their supporting affidavits various
issues of Philippine law, such as the enforceablilty of forum
selection clauses or the availability of class action relief.
However, Mr. Capuyan's statement that the jurisdiction of the
"voluntary arbitrators" and the National Labor Relations
Commission would not extend to statutory wage claims is
uncontested.   Dodson Decl., Exh. D at ¶ 4.

must be filed with the Clerk of the Court, with a courtesy copy to Judge Irizarry, within ten days.  Failure to file objections within the specified time waives the right to appeal.  <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

**SO ORDERED.**

Dated:  Brooklyn, New York
        March 16, 2009

_____/s/_____
MARILYN D. GO
UNITED STATES MAGISTRATE JUDGE