UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------x

SYLVESTER DZIENNIK, MIECZYSLAW KIERSZTYN, FERDYNAND KOBIEROSKI, individually and on behalf of all persons similarly situated,

Plaintiffs,

- against -

SEALIFT, INC., SEALIFT HOLDINGS, INC., FORTUNE MARITIME INC., SAGAMORE SHIPPING INC., VICTORY MARITIME, INC.,

Defendants.

**VERDICT: MEMORANDUM & ORDER**
**05-cv-4659(DLI)(JRC)**

----------------------------------------------------------x

JOSEF FELSKOWSKI,

Plaintiff,

- against -

SEALIFT, INC., SAGAMORE SHIPPING INC.,

Defendants.

**VERDICT: MEMORANDUM & ORDER**
**04-cv-1244(DLI)(JRC)**

----------------------------------------------------------x

MIECZYSLAW KIERSTIN,

Plaintiff,

- against -

M/V ADVANTAGE, ET. AL.,

Defendants.

**VERDICT: MEMORANDUM & ORDER**
**06-cv-5405(DLI)(JRC)**

----------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On October 3, 2005, Plaintiffs Sylvester Dziennik ("Dziennik," or "Class Representative"), Mieczyslaw Kiersztyn ("Kiersztyn"), and Ferdynand Kobierowski ("Kobierowski"), individually and on behalf of all persons similarly situated (collectively, "Class Plaintiffs"), brought this class

action against defendants Sealift, Inc. ("Sealift"), Fortune Maritime Inc. ("Fortune"), Sagamore Shipping, Inc. ("Sagamore"), and Victory Maritime, Inc. ("Victory") (collectively, "Defendants") alleging violations of federal maritime law, specifically under Sections 10313 and 11107 of the Seamen's Wage Act, codified at 46 U.S.C. § 10301, *et seq*.

After more than twenty years of complex litigation, the parties agree that one narrow issue remains for the Court to decide at this bench trial: whether the defense of laches is applicable to the Polish seafarers' claims. The parties decided to have the Court conduct this bench trial on paper, through briefs, exhibits, and deposition testimony, as opposed to hearing live in-person testimony. *See*, Pls.' Opening Brief ("Pls.' Brief"), Dkt. Entry No. 294; Defs.' Opening Brief ("Defs.' Brief"), Dkt. Entry No. 295; Pls.' Reply, Dkt. Entry No. 297; Defs.' Reply, Dkt. Enty No. 296.[1] For the reasons set forth below, the Court concludes that the defense of laches applies to the Polish seafarers' claims and, consequently, the Polish seafarers' claims predating October 5, 2002 are dismissed with prejudice.

## FINDINGS OF FACT

The Court makes the following findings of fact based upon the facts that the parties have highlighted as relevant to the issue of laches. These facts are organized by each witness identified by the parties, including: (1) Josef Felskowski ("Felskowski"); (2) Sylvester Dziennik ("Dziennik"); (3) Ferdynand Kobierowski ("Kobierowski"); (4) Mieczyslaw Kiersztyn ("Kiersztyn"); and (5) Mariusz Lenckowski ("Lenckowski").

### I. Josef Felskowski

Felskowski completed three years of vocational school and studied sea fishery. *See*, Felskowski Depo Pt. 1 ("Felskowski Depo – 1"), Dkt. Enty No. 289-9 at 7:14-17. In 1976, he

[1] Unless otherwise noted, the Court's references to docket entries are to those filed under the man case with Docket No. 05-cv-4659.

obtained his motorman's credential. *Id*. at 25:3-6. Thereafter, he became a professional seaman and worked on local fishing boats, which led to his employment as a motorman in a boat's machine room. *Id*. at 25:10-27:23. By 1990, he had obtained skills in repairing and overhauling main ship engines. *Id*. at 31:5-9. Around the same time, Felskowski obtained employment through the Morska Agency ("Morska"), an employment recruiting agency. *Id*. at 41:4-13; *See also*, Felskowski's Seaman Book, Dkt. Entry No. 210-15 at 2. His employment history also includes working aboard several non-US flagged vessels from 1990 through 1998. *See*, Felskowski's Seaman Book at 3-8.

On September 10, 1998, Felskowski joined the MV CHEKOV, which changed its name to the Ascension during his employment with Sealift. *Id*. at 9; Felskowski Depo – 1 at 53:23-55:5. His employment with Sealift on the Ascension included five separate employment periods: (1) January 7, 1999 to August 4, 1999; (2) September 6, 1999 to April 6, 2000; (3) May 12, 2000 to November 13, 2000; (4) January 12, 2001 to July 20, 2001; and (5) September 7, 2001 to November 9, 2001. *Id*. at 55:6-59:24; *See also*, Felskowski's Seaman Book, Dkt. Entry No. 289-15 at 10-14.

Felskowski testified that he had no knowledge that his employment was illegal or contrary to United States law. Additionally, when questioned about wages that were due under the contracts negotiated through Morska, Felskowski explained that he had been paid in full, notwithstanding a separate restitution issue that was related to an injury. *See*, Felskowski Deposition Pt. 2 ("Felskowski Depo – 2"), Dkt. Enty No. 289-10 at 120:7-22; 122:5-12; 123:5-13; 128:7-14. For that separate issue, he testified that he followed Paragraph XV of his employment contracts, which provides that "[a]ny disputes that may arise from the contract of employment should be resolved between the seaman and the employer directly, with the assistance of Morska. In case agreement

cannot be reached, Polish court and Polish law should apply." *Id*. at 120:14-21; 122:16-21; *See also*, Felskowski's Employment Contracts ("Contracts"), Dkt. Entry Nos. 21-2; 21-3; 21-4; 21-5; 21-6.[2]

**II. Sylvester Dziennik**

Dziennik graduated in August 1968 from a technical high school, where he enrolled in mechanical and electrical courses. *See*, Dziennik Deposition – 1 ("Dziennik Depo"), Dkt. Entry No. 289-2 at 13:23-14:12. Thereafter, he worked shore side as a Maritime Radio Service Technician until 1988, except for serving in the military from September 1968 to September 1970. *Id*. at 15:19-16:11. While mostly self-taught, he passed the ship electrician exam in the early 1990s, but also had serviced ships without having the "proper papers[.]" *Id*. at 14:13-20.

In 1988, Dziennik became associated with Morska. *See*, Dziennik Depo – 1 at 36:9-21. Starting in 1991, Dziennik worked aboard various non-United States vessels as an electrician. *Id*. at 21:3-24:15; *See also*, Dziennik Seaman Book, Dkt. Entry No. 289-12 at 1-11. Notably, Sealift employed Dziennik aboard United States flagged ships, the Cleveland and Ascension, as a student electrician from June 10, 2000 until September 24, 2000, and as an electrician from January 12, 2001, until May 25, 2001. Dziennik Depo at 33:12-25; 44:15-21; *See also*, Dziennik Seaman Book at 12-13. Dziennik's employment with Sealift was facilitated by Morska. *See*, Dziennik Depo at 36:9-38:20; *See also*, Dziennik Seaman Book at 12-13. Dziennik had a close working relationship with a Morska agent named "Detric" and trusted Morska to collect and pay his taxes. Dziennik Depo at 39:7-13; 43:16-44:14. According to Dziennik, he only had two interactions with Sealift Management. *Id*. at 35:7:25.

[2] These docket entries can be found under docket 04-cv-1244.

At some point in 2001, while employed aboard the Ascension, Dziennik had a conversation with Josef Felskowski, a fellow Polish seafarer, during which they discussed the fact that United States seafarers earned more than they did. *Id.* at 30:12-31:7. However, as early as summer 2000, Dziennik knew that he was being paid less than American seafarers on board the Cleveland. Indeed, he testified that, at that time, "[i]t was a very mixed crew over there . . . People were mentioning, I don't remember names, you know, why are your earnings so little? Because, for example, American electricians earn much more." *Id.* at 29:22-30:11. Nonetheless, according to Dziennik, his first appreciation that a possible basis existed to file a lawsuit against Sealift occurred in Fall 2004 during a telephone conversation with Felskowski, which discussion continued when they met in person in January 2005. *Id.* at 94:14-95:6. Dziennik testified that he had no knowledge that his employment was illegal or that any engagement or hiring was contrary to the laws of the United States.

**III. Mieczyslaw Kiersztyn**

After graduating high school, Kiersztyn attended technical school for three years, where he specialized in electrical studies. *See*, Kiersztyn Deposition – 1 ("Kiersztyn Depo – 1"), Dkt. Entry No. 289-6 at 14:12-22. Between 1958 and 1960, Kiersztyn enrolled in courses at the Maritime Construction School and, from 1962 to 1963, he served in the Polish Navy. *Id.* at 25:9-18; 26:7-9. Kiersztyn also attended a maritime academy leading to a certification as an electrician. *Id.* at 17:10-18:11. Afterwards, he was employed as a shoreside ship electrician. *Id.* at 15:5-11. By 1973, Kiersztyn received his first maritime credential as "Officer – Electrician" issued by the Maritime Agency in Szczecin. *Id.* at 17:10-20:21. At the same time, he became a member of the Polish Union of Maritime Fishermen, which continued until 1989. *Id.* at 31:8-32:22.

Between 1973 and 1975, Kiersztyn worked on fishing boats. *Id*. at 15:20-25; 19:15-17. Thereafter, he worked with Polish Ocean Lines on cargo vessels as an electrician. *Id*. at 19:18-20:13. From 1977 to 1989, he was employed by the Polish Baltic Shipping Company as a ship's electrician. *Id*. at 30:5-9. Until 1989, Kiersztyn's employment had been solely as an electrician on Polish flag vessels. *Id*. at 30:23-25.

Starting in 1989, Kiersztyn began working on Greek, Norwegian, and German flag ships. *Id*. at 42:11-43:15. From 1994 to 2003, Kiersztyn used various agencies in Poland to obtain jobs. *Id*. at 62:18-21. When boarding a ship to begin his employment, Kiersztyn typically provided the captain with his passport, Seaman's book, Certificate of Employment, and various certificates attesting to his credentials. *Id*. at 90:6-13.

Between June 5, 2003 and August 17, 2003, Kiersztyn worked for Sealift aboard the Advantage, and Sealift was the only United States seafaring company he had worked for. *Id*. at 12:18-22; *See also*, Kiersztyn Deposition – 2 ("Kiersztyn Depo – 2"), Dkt. Entry No. 289-7 at 103:25-104:4. Kiersztyn obtained employment on the Ascension through Morska, which was the only occasion he ever used this agency. Kiersztyn Depo – 1 at 62:8-63:10. When Kiersztyn boarded the Advantage, the captain told him he was employed as an electrician. *Id*. at 94:2-7.

On August 13, 2003, Kiersztyn was told by the boatswain aboard the Ascension that Kiersztyn might be entitled to wages higher than his contract. This occurred after the boatswain had attended a meeting held by an American trade union called Seafarers International Union ("SIU") that same day. *Id*. at 53:5-54:9; 54:21-55:2 55:7-11. Thereafter, Kiersztyn contacted SIU's representative to join the union and receive higher wages; however, the representative told Kiersztyn that his employment aboard the ship actually was illegal. *Id*. 54:12-20; 55:3-56:8.

After SIU's representative told Kiersztyn this, Kiersztyn inquired with a member of Sealift's Technical department about his employment who vaguely responded: "this is how it is supposed to be" and "[t]hat all [such] matters are arranged between Sealift and Morska." *See*, Kiersztyn Deposition – 3 ("Kiersztyn Depo – 3"), Dkt. Entry No. 289-8 at 208:5-210:11. Kiersztyn also complained to the Chief Engineer and First Engineer who told him that his wages were the terms of his employment and there was nothing about them that could be changed. Kiersztyn Depo – 2 at 136:14-137:3; 146:5-20. Notably, Kiersztyn explained that he did not know that his employment violated the law because he listened to every directive he received and he did not know American law. *Id*. at 208:5-13.

On August 17, 2003, Kiersztyn left the vessel for medical reasons and saw doctors in Poland on August 18, 2003. *Id*. at 146:21-149:7. Kiersztyn believed he was entitled to 126 days of sick leave from Sealift, but Sealift only paid him sick leave wages for 48 days. *Id*. at 148:21-151:12.

## IV. Ferdynand Kobierowski

Kobierowski attended vocational school, where he studied to become a general and land electrician. *See*, Kobierowski Deposition – 1 ("Kobierowski Depo – 1"), Dkt. Entry No 289-4 at 10:25-11:7. From 1978 to 1986, he studied the operation and servicing of radar equipment and container loading equipment, for which he became licensed. During this time, Kobierowski also took courses in ship automation, operations of loading equipment containers, and servicing of container loading equipment. Kobierowski also has an equipment operator license and worked as an operator from 1979 to 1986. *Id*. 14:1-18:2.

Kobierowski has worked on ships for several decades, including as an electrician during ship construction from 1974 to 1978. *Id*. 11:13-12:6. From 1979 until 1987, Kobierowski worked

as a serviceman for ship container equipment. In 1987, he became a member of the Polish Mariners and Port Workers Union, but was never a member of the SIU. *Id*. at 18:2-19:14. That same year, Kobierowski began working on board a vessel at sea for the first time. *Id*. at 21:16-20.

The first and only time Kobierowski was employed on a United States flagged vessel was aboard Sealift's Advantage vessel. *Id*. at 25:16-18; 28:10-13. Notably, he was employed as an electrician aboard the Advantage on four occasions: (1) October 4, 2001 to March 7, 2002; (2) June 24, 2002 to November 25, 2002; (3) January 30, 2003 to May 25, 2003; and (4) August 22, 2003 to February 14, 2004. *Id*. at 48:16-50:20; 74:7-9; 74:13-16; 76:23-77:24; 85:14-86:5; 101:18-21; *See also*, Kobierowski Seaman Book, Dkt. Entry No. 289-13 at 14-16. His first contact with Sealift was several months prior to joining the Advantage when he submitted his "readiness" materials to Morska. *Id*. at 29:7-15. The terms of his employment were made possible by Morska. *Id*. at 28:20-29:25.

When Kobierowski started working on the Advantage in October 2001, he worked with four other Polish seamen and, eventually, spoke with ten to twenty other Polish seamen who worked on Sealift vessels in various positions, including Kiersztyn and Dziennik. *Id*. at 55:16-58:16. It is not a far stretch of the imagination that, given the close quarters of working on a ship, these seafarers would have spoken about their wages. Indeed, through conversations with these Polish seamen and other crew members, Kobierowski came to believe for the first time that, although he was paid all the money provided for by his contract, he was owed more money by Sealift, which he requested from the captain. *Id*. at 107:3-113:2. Notably, Dziennik also confirmed in his deposition that "[b]eing on so many ships it's only normal that one talks about earning." Dziennik Depo – 1 at 29:4-7.

After completing his first term of employment on the Advantage in March 2002, Kobierowski returned for a second term of employment with the understanding that he would receive a bonus. Kobierowski Depo – 1 at 75:6-15. Bonuses were determined by the "percentage of the amount earned during the entire contract," not on merit or performance. *Id.* at 75:16-76:9. Apparently, Kobierowski did not receive that bonus after disembarking. *Id.* at 91:24-92:5. However, Kobierowski returned to the Advantage for a third term only after receiving a portion of his bonus. *Id.* at 95:8-20.

During his fourth and final employment term, Kobierowski saw a letter stating that Polish seafarers were not entitled to any additional pay. *Id.* at 96:18-97:3. For those reasons, Kobierowski decided he never would return to Sealift. *Id.* at 97:24-98:3. Additionally, during his last period of employment, he sustained injuries that resulted in a medical departure. *See*, Kobierowski Deposition – 2 ("Kobierowski Depo – 2"), Dkt. Entry No 289-5 at 100:24-101:22. Afterwards, based on a review of pay vouchers and payrolls for all periods he was on the vessel, Kobierowski confirmed he had received all the money owed to him under his contracts. *Id.* at 104:19 – 110:3.

Finally, Kobierowski contends that he first became aware of his ability to file a claim regarding the illegality of his employment through telephone conversations with other individuals, including Kiersztyn and Dziennik. *Id.* at 113:24-116:4. He also contends that he never had knowledge that his employment aboard Sealift vessels was illegal prior to speaking with his attorneys. *Id.* at 122:13-17.

**V. Mariusz Lenckowski**

During the relevant periods, Lenckowski served as manager of the crewing department at Morska, Sealift's exclusive Polish crewing agent. Lenckowski Deposition ("Lenckowski Depo"), Dkt. Entry No. 289-11 at 9:8-10:11; 22:19-23:5. He testified that he personally dealt with the

Polish seafarers working aboard Sealift vessels during the class period. *Id.* at 78:5-78-11. Lenckowski also testified that these Polish seafarers knew or should have known before they boarded Defendants' vessels that they would be paid less than the U.S. seafarers. *Id.* 78:5-79:8.

## DISCUSSION

### I. Legal Standard

"The existence of laches is a factual question that requires the court to weigh the equities of each case." *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 193–94 (2d Cir. 2018) (citation omitted). As this Court previously explained, Section 11107 of the Seaman's Wage Act, 46 U.S.C. § 10301, *et seq.*, does not contain a statute of limitations. *See*, Opinion & Order dated September 30, 2013 ("O&O"), Dkt. Entry No. 204 at 6. Nonetheless, admiralty courts are guided by local limitation periods. *See*, *Marine Watchmen Inc. v. Venture Cruise, LLC*, 2021 WL 7906556, at *6 (E.D.N.Y. Feb. 23, 2021). Indeed, when a claim originates "after the expiration of the state limitations period, a court applying maritime law asks why the case should be allowed to proceed; when the suit, although perhaps long delayed, has nevertheless been brought within the state limitations period, the court asks why it should not be." *DeSilvio v. Prudential Lines, Inc.*, 701 F.2d 13, 15 (2d Cir. 1983).

Significantly, as this Court previously explained, "[t]he analogous state statute of limitations [also] determines where the burden of proof falls[;] if a plaintiff files a complaint within the analogous statutory period the burden of proving unreasonable delay and prejudice falls on the defendant." O&O at 4, 12 (internal quotation mark and citation omitted) (explaining that the analogous statute of limitations is three years pursuant to New York CPLR Section 214(2)). Ultimately, the test for laches bears on whether there was inexcusable delay and prejudice to the opposing party. *Leopard Marine & Trading, Ltd.*, 896 F.3d at 193–94 (explaining that "[t]hese

two factors are not to be viewed independently") (quoting in parenthetical, *Larios v. Victory Carriers, Inc.*, 316 F.2d 63, 67 (2d Cir. 1963)).

Here, the parties agree that the claims relevant to the defense of laches fall outside the statute of limitations. *See*, Pls.' Brief at 11; *See also*, Defs.' Brief at 1. Consequently, the burden falls upon Plaintiffs to show why this case should be allowed to proceed. *See*, O&O at 14, 20.

When addressing the defense of laches, courts in this Circuit balance the excuse for delay against the prejudice to the defendant to determine whether it would be equitable in the specific circumstances of the case for the claim to go forward. *See, Kristenson-Petroleum, Inc. v. Blanc Navigation, Sealock Tanker, Co.*, 2005 WL 2899868, at *1 (2d Cir. Nov. 3, 2005). This requires courts to "weigh the legitimacy of his excuse, the inference to be drawn from the expiration of the state statute, and the length of the delay, along with evidence as to prejudice[.]" *Larios*, 316 F.2d at 67. For example, "[w]here there has been no inexcusable delay in seeking a remedy and where no prejudice to the defendant has ensued from the mere passage of time, there should be no bar to relief." *Id.* Moreover, a relatively weak excuse for delay, coupled with some prejudice to defendants, will result in dismissal for laches. *See*, *Dickey v. Alcoa S.S. Co., Inc*, 1980 WL 6688485 (S.D.N.Y. Mar. 25, 1980), *aff'd*, 641 F.2d 81 (2d Cir. 1981). Notably, and relevant here, "there may be cases where the plaintiff's evidence as to excuse for the delay is so insubstantial that the court need not call on the defendant to come forward with evidence of prejudice." *Larios*, 316 F.2d at 67. While Plaintiffs contend that there was no delay because they did not possess the requisite factual basis to believe that their employment was illegal, the Court disagrees.

## II. Analysis

As an initial matter, Plaintiffs contend that wages have nothing to do with the defense of laches because the only claims left relate to the shipping articles, citizenship, and merchant mariner

documents. Moreover, they contend that wages under the contracts were paid in full and, consequently, there was no need for Plaintiffs to inquire about their wages. *See*, Pls.' Brief at 13-14. While, Plaintiffs are correct that those claims remain, the issue here is not about whether their wages were paid in full under the contract. Instead, the issue is whether Plaintiffs possessed facts that would cause a person of ordinary intelligence to inquire about his or her employment status. When a person possesses such information that reasonably would prompt an inquiry, that person would be charged with knowing what would have been derived from their inquiry. *See*, O&O at 17 (explaining that Plaintiffs are "chargeable with such knowledge as [they] might have obtained upon inquiry, provided the facts already known by [them] were such as to put upon a man of ordinary intelligence the duty of inquiry.") (quoting in parenthetical, *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370 (1893)); *See also*, *Preston v. Am Fed'n of Television and Radio Artists*, 2002 WL 1009458 at *3, 11-12 (S.D.N.Y. May 16, 2002) (explaining that, in light of *Johnston*, the laches period begins to run when plaintiffs discover limited facts that create a duty of inquiry and they are charged with knowing the additional facts they may have learned about to support their claim upon inquiry, including those that may support an actionable claim), *aff'd*, 63 Fed. Appx 536, 538-39 (2d Cir. 2003).

Notably, Class Representative Dziennik testified that he first believed something was wrong with his wages in 2000 aboard the Cleveland because American seafarers were being paid more money. *See*, Dziennik Depo – 1 at 28:12-30:11. Moreover, during the first five months aboard the Ascension, Dziennik, Felskowski, and at least three other Polish workers had discussions about earnings and wages. *Id.* at 30:12-31:7. Kobierowski's similar suspicions arose sometime after his employment aboard the Advantage began in October 2001, based upon his conversations with other crew members, despite being paid all the money provided for by his

contract. *See*, Kobierowski Depo – 1 at 55:16-58:16; *See also*, Kobierowski Depo – 2 at 111:6-8. The Court finds that this most likely happened earlier in Kobierowski's employment, as opposed to later, based upon Dziennik's testimony that "[b]eing on so many ships[,] it's only normal that one talks about earning." *See*, Dziennik Depo – 1 at 29:4-7.

Additionally, Lenchkowski testified that, even before these dates, Polish seafarers knew or should have known that, before they boarded, working for a foreign ship involves different rates of pay for different nationalities. Lenchkowski Depo at 78:5-79:8. These voyages began as early as the late 1990s. The class period here begins in 1999.

It is relatively straightforward and obvious to the Court that a person of ordinary intelligence certainly would inquire about his or her employment status and question his wages upon learning or becoming aware that there was a wage disparity based upon nationality, here, Polish seafarers versus American seafarers. If Plaintiffs had done so, they presumably would have discovered that their employment was illegal. This is evidenced by the fact that, upon learning he might be entitled to more pay from the boatswain aboard the Ascension, Kiersztyn sought out an SIU representative to discuss the matter. *See,* Kiersztyn Depo – 1 at 53:5-55:11. It was only after he inquired with the SIU representative that he learned he was employed illegally. *Id.* at 54:12-20; 55:3-56:8. These facts support Defendants' position that Plaintiffs' duty to inquire arose when they learned about the pay disparity between Polish and American seafarers. Moreover, as Defendants properly contend, based upon their years of employment on vessels and knowledge of the industry, Plaintiffs would have or should have known that something was not right with their employment because: (1) of the disparity in wages among seafarers of different nationalities; (2) they did not sign the ships' articles; (3) they were Polish citizens; and (4) they did not have merchant mariners' credentials. *See*, Defs.' Reply at 5.

Plaintiffs nevertheless argue that actual, or at least constructive, knowledge is required to form the basis for the cause of action, which occurred when Kiersztyn actually learned that his employment was illegal. *See*, Pls' Brief at 14, 16. However, as discussed above, and in this Court's prior rulings, the law is that a plaintiff need only possess such knowledge as would cause him or her to inquire and is imputed with whatever knowledge would have been derived from such an inquiry. *See*, O&O at 17; *See also, Preston*, 2002 WL 1009458 at *3, 11-12.

Plaintiffs further contend that they relied upon their employment being lawful because Morska was negotiating their wage rates with Sealift. *See*, Pls.' Brief at 13. Similarly, they contend they relied upon the Ship Master and Lenckowski's work at Morska in assuming their employment was lawful. *Id*. at 13-14; 19. Kiersztyn explained that he and other seafarers like him did not know their employment violated the law because they listened to every directive they received and did not know American law. *See*, Kiersztyn Depo – 2 at 208:5-13. Thus, Plaintiffs aver that it is unlikely that any of them would have consulted a lawyer, Polish or American, based upon how they were "so advised" by those around them. See, Pls.' Brief at 14. The Court is unconvinced.

While Lenchkowski testified that he believed that Plaintiffs' presence on Defendants' vessels did not violate the law, Lenchkowski could not make such an assessment or provide legal advice because he was not an attorney. The same applies for Plaintiffs' reliance on Morska and the Shipmaster.

Also unavailing is Plaintiffs' contention that they would not have sought advice of counsel who specialized in United States maritime law because their contracts provide that a Polish court and law shall apply to any disputes. First, Plaintiffs did nothing to learn about their legal rights about the wage disparity from any lawyer, let alone a Polish lawyer. Second, it is well-established that ignorance of the law is not a defense or proper explanation to one's actions or inaction. *See*,

O&O at 18. Significantly, it is a well established principle of international law that, in most circumstances, United States law governs actions on board a United States flagged vessel registered to a United States company that engages United States ports.[3] *See, McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20–21 (1963) ("In addition, our attention is called to the well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship."); *Cf. Kollias v. D & G Marine Maint.*, 29 F.3d 67, 72 (2d Cir. 1994) (noting some instances where United States law may not apply). Thus, under these circumstances, not only are persons of ordinary intelligence, and particularly persons like Plaintiffs who have years of extensive seafaring experience, would have known to inquire about any available remedies under United States law. *See, Dickey*, 1980 WL 6688485 (characterizing as "virtually non-existent" the plaintiff seaman's excuse for delay based upon his poor education and lack of knowledge of his rights under maritime law, as "such a view would, in fact, eviscerate the doctrine of laches, affording a ready excuse for anyone who was not a maritime lawyer.").

Ultimately, Plaintiffs' contention boils down to their reliance on non-lawyers to maintain that their employment was illegal, all while being experienced seafarers who had a clear basis for suspecting, in most cases by the year 2000, that their contract did not represent the proper wage that should have been paid to a lawful seafarer. It follows that Plaintiffs had the requisite knowledge to impose on a person of ordinary intelligence the duty to inquire. Moreover, they were imputed with any knowledge that they might have obtained upon inquiry, *i.e.*, knowing that their employment was illegal. Taken together, Plaintiffs' contentions bear no fruit to support an excuse for their delay in filing their complaint on October 2, 2005, which is outside the statute of

[3] The parties do not dispute that the Court has subject matter jurisdiction over the activities aboard the subject vessels because United States law governed the ship's activities.

limitations. The Court thus finds that Plaintiffs fail to provide any excuse for delay because they possessed sufficient facts that triggered their duty to inquire.

Accordingly, while under normal circumstances the Court must determine whether Defendants were prejudiced by Plaintiffs' delay, "[P]laintiff[s'] evidence as to excuse for the delay is so insubstantial that the [C]ourt need not call on the defendant to come forward with evidence of prejudice." *Larios*, 316 F.2d at 67. Even if the Court were to accept Plaintiffs' weak excuse for delay, such an excuse, coupled with some prejudice to defendants, necessarily results in dismissal of claims for laches. *See, Dickey*, 1980 WL 6688485.

Generally, prejudice may result when a delay "makes it difficult to garner evidence," or where a "change in position" makes it inequitable to allow a plaintiff's claim to proceed. *Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 424 (2d Cir.1992). Additionally, as the Second Circuit recently explained, a laches defense may be justifiable where delay diminishes a party's ability to absorb a loss. *Leopard Marine & Trading, Ltd.*, 896 F.3d at 196. Thus, prejudice can occur when a party is unable to mitigate their loss or exposure. Moreover, "[a] defendant has been prejudiced when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim." *Solow Bldg. Co., LLC v. Nine West Grp., Inc.*, 2001 WL 736794, at *5 (S.D.N.Y. June 29, 2001) (internal quotation marks omitted), *aff'd*, 48 F. App'x 15 (2d Cir. 2002).

Here, Plaintiffs continued to sign contracts and increase Defendants' exposure, all while having the requisite knowledge that invoked their duty to inquire. Indeed, Plaintiffs entered into employment contracts while acknowledging that they were paid everything owed to them under their contracts despite their purported concern that they were being paid less than their American counterparts. By asking the Court to forgo the defense of laches, Plaintiffs essentially implore the

Court to endorse the notion that litigants can sit on their hands for an extended period while compounding a defendants' exposure. Such a result is not equitable under the facts before the Court. *See*, *Guenther v. Sedco, Inc.*, 1998 WL 898349, at *3 (S.D.N.Y. 1998) ("[laches] involves a determination whether it would be inequitable to permit the claim to be enforced in light of some change in the condition or relations of the parties.").

Here, the Court finds that Defendants suffered some prejudice through increased liability, damages and costs incurred due to Plaintiffs continued entering into contracts with Defendants without any complaint about wages, and the inevitable prejudice that comes from the length of a particular case. *See*, Defs' Brief at 16-23; *Cook v. City of Chicago*, 192 F.3d 693, 696 (7th Cir. 1999) (explaining that an employer's potential liability for backpay constitutes "palpable prejudice" that could justify a finding of laches); *Corbin v. Sw. Airlines, Inc.*, 2019 WL 3766580, at *5–6 (S.D. TX. Aug. 9, 2019) (finding prejudice through the defense of laches when the plaintiff's delay in filing suit materially prejudiced the defendant-employer by inflating damages, including prejudgment interest and costs); *Brown v. Royal Caribbean Cruises, Ltd.*, 2000 WL 34449703, at *3 (S.D.N.Y. Aug. 24, 2000) (explaining that employer-defendants "could suffer great prejudice from this delay due to the heightened wages and damages for which they might potentially be liable."); *Dickey*, 1980 WL 6688485 (explaining that some prejudice is almost inevitable from the length of a particular case). Accordingly, in light of the analogue state statute of limitations, Plaintiffs' claims that arose before October 2, 2002 are dismissed based on the defense of laches.

**CONCLUSION**

For the reasons set forth above, as the defense of laches is applicable to the Polish seafarers' claims predating October 5, 2002, those claims are dismissed with prejudice.

SO ORDERED.

Dated: Brooklyn, New York
November 9, 2026

/s/
DORA L. IRIZARRY
United States District Judge